# TEXAS COURT OF APPEALS, THIRD DISRICT, AT AUSTIN

---

## NO. 03-19-00881-CV

---

**J. B., Jr. and Y. R., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-17-003746, THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court rendered judgment terminating Y.R.'s and J.B., Jr.'s parental rights to their children, J.B. and J.A.B.[1] The trial court found that Y.R. (Mother) and J.B., Jr. (Father) each knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that they each engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). The court also found that Father failed to comply with a court order establishing actions necessary for him to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of their removal from their parents under Chapter 262 for abuse or neglect. *See id.* § 161.001(b)(1)(O). The court found that termination

---

[1] We use aliases to refer to the minors and to their adult relatives to protect the minors' confidentiality. *See* Tex. R. App. P. 9.8(a), (b).

of both Mother's and Father's parental rights was in the children's best interest. *See id.* § 161.001(b)(2). Mother and Father both appealed the trial court's order terminating their respective parental rights. Mother challenged the legal and factual sufficiency of the evidence supporting the finding that termination of her parental rights was in the children's best interest. Father challenged the legal sufficiency of the evidence supporting the (D), (E), and (O) findings and the factual sufficiency of the evidence supporting the finding that termination of his parental rights was in the children's best interest. We will affirm.

## BACKGROUND

In October 2016, the Department received a report that Mother had been found passed out in a car in a hotel parking lot leaving four-year-old J.B. and one-year-old J.A.B. playing in the parking lot unsupervised. The Department received a second report the next day that Mother had been passed out in the hotel elevator and that J.B. and J.A.B. had been left alone. By the time the Department received the reports, Mother was incarcerated, and the children were with Father and his mother, Tammy. When the Department contacted Father, he was uncooperative and verbally aggressive and told the Department to communicate with Tammy rather than with him. The Department contacted Tammy, who told them that Mother had been released from jail and had, over her objection, taken the children. The Department determined that Mother had taken the children to south Texas to stay with her mother for a brief time and then returned to Austin. The Department advised Mother not to let the children be with Tammy because of her history of neglectful supervision and her criminal history.

In November 2016, Father was arrested for delivery of a controlled substance. Mother informed the Department that she and the children had been with her mother in south Texas but had returned to Austin. In December 2016, Mother was arrested for theft at a

shopping mall in Austin. Mother informed the Department that she had been incarcerated for three to four days but had been released on house arrest and that she was staying in Austin with a female friend. In January 2017, Mother was arrested on a warrant for a charge of child endangerment related to the October 2016 incidents of neglect at the hotel.[2] A law enforcement officer informed the Department that the children would be placed with Father. After she was released later that month, Mother contacted the Department to find out what she needed to do to complete the Department's investigation. At the Department's request, Mother agreed to participate in Family Based Safety Services (FBSS), an out-of-court program through which the Department attempts to provide in-home services to a family. The Department hoped the program could address Mother's drug use and unstable housing situation and Father's drug use as well as provide parenting and other services.

The FBSS program lasted from February to March 2017 during which time Mother and the children were living with a friend and Father was living with Tammy. The children were not to be around either their maternal or paternal grandmothers because of their histories with the Department. The Department met with Mother and the children monthly. During that time, J.B. made an outcry that his mother kicked him and hit him. Mother denied that and stated that J.B. "was a liar." Mother started a nurturing parenting program but was discharged because of irregular attendance. In April, the Department learned that Father had been arrested for possession of methamphetamine. When the Department attempted to visit Mother and the children in May, it learned that Mother was incarcerated because she tested positive for cocaine in a drug test administered as part of her pending criminal case. The children

_____

[2] Mother's counsel suggested at trial that the warrant was for traffic violations rather than for child endangerment, but it was undisputed that Mother was arrested and taken into police custody.

were with their maternal grandmother and aunt in south Texas. Mother told the Department that she did not send the children to stay with Father because he would not cooperate with the Department and because he used marijuana. In June 2017, Father and Mother were both incarcerated and the Department placed the children with their maternal aunt in south Texas.

Having determined that the FBSS program was proving unsuccessful, the Department filed an original petition seeking temporary managing conservatorship of the children and to terminate Mother's and Father's parental rights to J.B. and J.A.B. in the event reunification efforts failed. J.B. and J.A.B. remained with their maternal aunt until August 2017 when she informed the Department that she could not care for them due to health issues. The children were placed with a foster parent in Austin. That placement was unsuccessful because of J.B.'s behavioral issues, and the children were moved to another foster home in Austin in December 2017. By February 2018, Mother was engaging in recommended services. She complied with some, but not all, requested drug testing. Father was incarcerated and had not participated in recommended services. J.B. and J.A.B. both had psychological evaluations and were diagnosed with Post Traumatic Stress Disorder (PTSD). J.B. was behind in his reading skills, but with his foster parents' help and after school tutoring, he had caught up. The individual therapy sessions focused on working through J.B.'s and J.A.B.'s trauma. The children both had extensive dental needs and underwent a few surgeries and got fillings to correct problems with their teeth.

During the spring of 2018, Mother was doing well in parenting class and had participated in individual therapy. The Department agreed to extend the June 2018 deadline for the case because of Mother's progress. In May 2018, the parties entered into a Mediated Settlement Agreement for further temporary orders. Mother was to continue to engage in the

4

family service plan and follow the recommendations of the psychological evaluation. She was also required to take regular drug tests and was informed that skipping a test would result in a presumed positive result. Father did not attend the mediation, but his attorney was present. Father was to provide all certificates of completion or other proof of services completed while incarcerated and was ordered to notify the Department and provide his contact information within forty-eight hours of his release.

In July 2018, Mother was arrested, her probation was revoked, and she was incarcerated until the following October. Father was incarcerated for most of the year. After Mother was released, she lived with various people while working on the recommended services. The case went to trial in December 2018, but the Department requested a recess because Mother and Father had been released so recently from jail that the Department wanted to give them a chance to engage in more services and reestablish their relationships with J.B. and J.A.B. Mother and Father were to refrain from criminal activity and drug use. Father was to refrain from buying or selling drugs or associating with individuals who promoted criminal behavior.

In December 2018, the Department placed J.B. and J.A.B. with the Davidsons, who were Father's relatives. Mother was having weekly supervised visits with the children. When Father was released from jail, he also had supervised visits. The children continued to have behavioral issues, particularly after visits with their parents, and were engaged in weekly therapy. Father neither completed the recommended services nor refrained from criminal activity. Father had a positive drug test in November 2018 and failed to undergo a drug and alcohol evaluation. Mother, however, continued to make progress with the recommended services and was working and doing well. Meanwhile, the Davidsons had informed the Department they could no longer care for J.B. and J.A.B., so the Department placed them with the Smith family,

5

who were identified as J.B.'s and J.A.B.'s fictive kin. Mother was also living with the Smiths. In May 2019, the parties entered into another Mediated Settlement Agreement in which the Department agreed to a plan to return the children to Mother. Mother was to have supervised visits progressing to unsupervised and overnight visits with the goal of the children returning to live with Mother and the Smiths in July 2019. In June 2019, Mother tested positive for cocaine. Because the Smiths were unwilling to move Mother from their home and because the children could not stay in a home with a person who had a positive drug test, the Department placed the children with a foster family in Lometa, Texas.

The case was tried to the bench in a three-day proceeding. The court heard testimony regarding the circumstances surrounding the children's removal from their parents and the events driving the Department's decision to seek termination of Mother's and Father's parental rights. The court also questioned the witnesses. At the conclusion of the trial, the court found several predicate grounds for terminating Mother's and Father's parental rights to their children and that termination was in the children's best interest. The court rendered judgment terminating Mother's and Father's parental rights to J.B. and J.A.B. This appeal followed.

**DISCUSSION**

*Father's Challenge to Predicate Grounds for Termination*

The trial court found that Father knowingly placed or allowed J.B. and J.A.B. to remain in conditions that endangered their physical and emotional well-being and engaged in conduct or knowingly placed J.B. and J.A.B. with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). The trial court also found that Father failed to comply with a court order establishing actions necessary for reunification. *Id.* § 161.001(b)(1)(O). On appeal, Father challenges the legal

6

sufficiency of the evidence supporting these findings as well as the factual sufficiency of the evidence supporting the court's finding that termination of his parental rights was in the children's best interest.

In an appeal from the termination of parental rights, legal and factual sufficiency challenges require a heightened standard of review. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

We first consider Father's legal sufficiency challenge to the court's endangerment findings. In his brief, Father asserts only that because he was not able to complete the recommended services due to his incarceration, he "could not have negated the (D) grounds that brought the children into care, by doing services" and, likewise, "could not have negated the (E) grounds, by doing services." Father does not contend that there was no evidence at trial to support a finding that he engaged in conduct that endangered the children but, rather, maintains that his inability to participate in the recommended services prevented him from negating the trial court's

7

endangerment findings.  Father's participation in services, however, is unrelated to whether he engaged in conduct constituting child endangerment; i.e. conduct that exposed the children to loss or injury or jeopardized their emotional or physical well-being.  Assuming, however, that Father has adequately challenged it, we will review the evidence presented at trial to determine whether it was legally sufficient to support the trial court's endangerment finding.

Both subsections (D) and (E) require proof of child endangerment, that is, "exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being." *A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).  "Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct." *Id.*  "Although '"endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533).  Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act. *A.C.*, 577 S.W.3d at 699.  "Termination under this subsection must be based on more than a single act or omission; instead, 'what is required is a voluntary, deliberate, and conscious course of conduct.'" *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

"A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.*  Thus, "evidence of criminal

conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child." *Id.* at 360-61. "A factfinder may also infer that a parent's lack of contact with the child and absence from the child's life endangers the child's emotional well-being." *In re M.D.M.*, 579 S.W.3d at 765 (citing *In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.)); *see In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding that parent's criminal conduct, which resulted in parent's imprisonment and absence from child's life, created "emotional vacuum" in child's life that endangered child's well-being).

On this record, we conclude that the evidence is legally sufficient to support the trial court's finding under subsection (E) that Father engaged in conduct that endangered the children. Evidence showed that Father was incarcerated for most of J.A.B.'s life and a considerable part of J.B.'s life; that Father repeatedly engaged in illegal conduct including use, possession, and delivery of controlled substances such as Promethazine and methamphetamine; that Father's serial incarcerations caused him to be absent for much of the children's lives; that even during the times Father was not incarcerated he was inconsistent in visiting J.B. and J.A.B.; and that Father allowed J.B. and J.A.B. to stay with Tammy despite the Department's order that they not be with her because of her extensive criminal and Department history. The children's therapist Robin Beauregard testified that both J.B. and J.A.B. suffered from PTSD as a result of trauma experienced in their lives related to the instability of their living conditions. The trial court could reasonably have determined that Father's repeated criminal activity and incarcerations contributed to this trauma. Father himself testified that he understood that his involvement with drugs endangers the children's stability and security and that the loss of security and stability can cause emotional or psychological harm.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could form "a firm belief or conviction" that Father engaged in conduct that endangered J.B.'s and J.A.B.'s physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Furthermore, there was no significant disputed evidence that would render such finding unreasonable. *See In re J.F.C.*, 96 S.W.3d at 266. Because we have concluded that the evidence was sufficient to support the trial court's finding under subsection (E), we need not address Father's challenges to the trial court's other predicate findings under subsection (D) or (O). *See In re N.G.*, 577 S.W.3d 230, 235, 239 (Tex. 2019) (per curiam) (requiring appellate courts reviewing termination findings that are based on subsection (D) or (E) to ensure that evidence is sufficient to support at least one of those two grounds because finding under either could be used in future proceedings to terminate parent's rights to other children); *A.C.*, 577 S.W.3d at 698-99 & n.2 (noting that when appellant challenges both subsection (D) and (E) findings, appellate court needs to ensure that evidence is sufficient to support one of those grounds); *see also* Tex. Fam. Code § 161.001(b)(1)(M) ("The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E).").

### *Mother's and Father's Challenge to Best Interest Finding*

Mother asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest, and Father asserts a factual sufficiency challenge to this finding. The best-interest prong of the termination statute "is child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). When deciding the best-interest

issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *See* 544 S.W.2d 367, 371-72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The Department need not prove all the *Holley* factors as a "condition precedent" to termination, and the absence of evidence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination of parental rights is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27; *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

**The children's wishes**

The children's therapist, Robin Beauregard, testified that J.B. and J.A.B. both love Mother and would choose to live with her. She stated that neither of the children mentions Father very often at all. Beauregard testified that the children enjoy their visits with Mother if they are supervised and are excited to describe what happened during the visits. Beauregard testified that J.B. and J.A.B. have also expressed that they want to stay in their foster placement and continue to visit with Mother on a regular basis. Beauregard stated that the children expressed that if Mother made certain changes, they would "want to go back to live with her if they knew it would be that certain way." Beauregard stated that it is not unusual for children from abusive situations to express a desire to be with a parent even if the parent was neglectful and abusive. Danielle Hensen, the CASA volunteer assigned to the case, testified that the children love their

11

mother but "struggle with the bond." Henson stated that J.B. tends to keep some distance from Mother during visits.

**The children's current and future emotional and physical needs**

The testimony regarding J.B.'s and J.A.B.'s physical and emotional needs principally focused on the need for stability so they could continue to process the trauma they had experienced and learn methods to cope with their behavioral issues. One of the reasons several placements failed was that J.B. demonstrated aggressive behavior and severe "melt downs" accompanied by screaming and hitting his mother and J.A.B. Department case supervisor Melissa Fabian testified that both J.B. and J.A.B. suffer from PTSD and that when J.B. and J.A.B. were able to remain in one placement with routine and clear expectations, they were able to work through their trauma and behavioral problems. She expressed concern about the possibility that future placements could fail and the toll that would take on J.B. and J.A.B. Fabian testified that the children have been through a lot and that continuing to move from place to place would be detrimental to their well-being. Fabian stated that the instability, abuse, and neglect the children had experienced have compounded to the point where both children will need long term support and therapy that she did not believe either Mother or Father could provide. In her view, the stability that terminating Mother's and Father's parental rights would provide would be in the children's best interest.

Beauregard testified that J.B. wanted his therapy sessions with her to focus on how to deal with unsettling memories of living with Mother and how to develop appropriate coping skills. Beauregard stated that J.B. needed to learn that the mistakes Mother and Father made were not his fault or his responsibility. Beauregard emphasized the importance of routine and structure to children with PTSD, as well as the importance of redirection to address

12

aggression and outbursts. Beauregard testified that J.B. had assumed a caretaker role of J.A.B. and needs to learn to let that go and understand that the foster parents will take care of J.A.B. Beauregard also stated that J.B. and J.A.B. need to be allowed to "be kids" and to be involved in sports. With regard to J.A.B., Beauregard testified that he needed stability to process memories that bother him and to learn to play without being overly physical.

Hansen, the CASA caseworker, testified that J.B. and J.A.B. need parents who understand that their behaviors are the result of trauma they have experienced and who know how to address those behaviors in a way that makes the children feel safe and protected. Hansen opined that it would be best for the children to be the only children in the home because they need a lot of focus and attention paid to them. Hansen also stressed the need for the children to be in a stable living environment. Mallory Ladny, a Department caseworker assigned to the case in March 2019, also testified that J.B. and J.A.B. need a permanent home after having been moved so many times.

**Emotional and physical danger to the children now and in the future**

No evidence was presented that J.B. and J.A.B. were currently in any physical danger or that, if they were returned to their parents, they would be in the future. Ample and consistent testimony was presented that Mother and Father act appropriately with the children and that Mother in particular is very loving and caring during visits. Additionally, the children's therapist, caseworker, and CASA volunteer all testified that the children are safe and doing well in their current foster placement. Beauregard testified that the current foster placement is stable and has helped J.B. improve his behaviors. In that placement J.B. is healing and developing better coping skills. Beauregard stated that J.A.B. feels safe where he is and has been working on overcoming trouble sleeping and bed wetting. The structure and routine of the current foster

13

family has also helped J.A.B. succeed at school. Hansen testified that, after a transition period, J.B. and J.A.B. are doing well in their current foster placement. She stated that the foster parents are warm and clear and concrete about what is required of the children and that they joke and play with them.

The main concern expressed by the Department's witnesses at trial was the potential for future emotional harm to the children if they continue to be exposed to unstable home environments and do not have the structure and routine that is currently helping them to process the trauma they have experienced. Fabian testified that Mother's history of relapsing into drug use creates the potential for more emotional harm to J.B. and J.A.B. in the future. She also expressed concern that if the children were placed in a foster home without sufficient resources the placement could be unsuccessful and the children would have to be moved again, which would be more detrimental than having them remain in the current successful foster placement in Lometa. Fabian testified that the risk of further disruptions in the children's lives would be harmful to their emotional health.

**Placement proposed by parents**

Neither Mother nor Father asked that the court return J.B. and J.A.B. to their care. Both asked that their parental rights not be terminated and that J.B. and J.A.B. live with Sandra, Father's second cousin. Sandra was identified as a potential relative placement in the month or so preceding trial. Sandra, who is twelve years older than Father, testified that she raised him as a child and that she had contact with J.B. and J.A.B. when they were babies. Sandra testified that she was not aware of the circumstances of the case and did not know Mother well at all, but that she wanted to do whatever she could to help Father and ensure that J.B. and J.A.B. were placed with a relative. Father testified that he understood that if J.B. and J.A.B. were placed with a

14

relative, the children would risk exposure to members of the family who would negatively influence him and the children. Father stated that he would address this by spending time with those family members "on his own" rather than at family gatherings. Father testified that he wants J.B. and J.A.B. to be with his family and that he would "avoid the conflict." Mother testified that she does not know Sandra but would prefer that the children be with family rather than non-family.

The Department completed a home study for Sandra and, although the placement was conditionally approved, Department witnesses testified about concerns they had that would need to be addressed before they could recommend that the children be placed in Sandra's home. Fabian testified that Sandra would need a lot of support to meet the children's needs. Fabian noted that Sandra has four children of her own living with her and would need financial assistance to adequately care for J.B. and J.A.B. Fabian testified that adoption by Sandra would be the only way that such financial assistance would be available. Hansen expressed concern because Sandra had told her that her plan was to have her seventeen-year-old daughter take care of her younger two children while she focused on J.B. and J.A.B. Hansen testified that she was concerned about this arrangement. Sandra also told Hansen that her daughter planned to enter the military within the next year. Hansen echoed the concern about Sandra's financial ability to care for six children as well as concern that one of Sandra's older children was on probation for criminal activity.

The Department's witnesses testified that while they would continue to consider Sandra as a placement if their concerns could be alleviated, they would still recommend terminating Mother's and Father's parental rights so that Sandra could receive necessary financial assistance and so that if the placement was unsuitable, the Department could act

15

quickly to find an alternative for J.B. and J.A.B. During her testimony Sandra acknowledged that adopting the children would be the best alternative for her because of the availability of financial assistance. Sandra also stated that she understood the Department's position that termination of parental rights made sense so that if placement with her did not work out, the Department could act quickly to place the children elsewhere.

Ladny summarized the reasons the Department believed termination of Mother's and Father's parental rights to be in the children's best interest. She testified that the Department had heard from other relatives that they would be willing to adopt the children if parental rights were terminated but would not be a placement for the children otherwise. Thus, termination of parental rights would open up more options for a relative placement. Ladny testified that adoption also opens up possibilities for financial assistance for J.B. and J.A.B. that they would not otherwise have. Ladny stated that not terminating Mother's and Father's parental rights limits the Department's options and ties its hands in terms of its ability to further explore placements that would be best for J.B. and J.A.B. Hansen testified that, while not seeing Mother and Father in the future would be harmful for them, J.B. and J.A.B. would suffer more trauma if they continued to have a relationship with Mother. Hansen testified that this opinion was based on the fact that Mother, despite having participated in all the recommended services, continues to engage in the same choices that traumatized the children and brought them into the Department's care. Hansen testified that her recommendation was to terminate Mother's and Father's parental rights, have the children remain in their current foster placement, and explore whether adoption by a relative or by the foster parents was the better option.

The common theme to the Department's witnesses was that three years of working to reunify Mother with J.B. and J.A.B. had failed because each time reunification

16

was imminent, Mother relapsed into drug use. Mother's therapist, Curtis Laurence, testified that although Mother has periods of sobriety, she struggles with periods of relapse. Laurence expressed concern about whether Mother can maintain the positive changes she has made and whether she can maintain sobriety. Laurence expressed no concern about Mother's parenting abilities but testified that, although she had worked hard, it would be difficult for Mother to change behaviors such as drug use and criminal activity that are harmful to her and to her children. Fabian testified that she believed the Department's efforts at reunification had ultimately made the children's situation worse because it had exposed them to a longer period of instability.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could form "a firm belief or conviction" that termination of Mother's and Father's parental rights was in J.B.'s and J.A.B.'s best interest. After considering the disputed evidence, we conclude that a reasonable factfinder could have resolved that evidence in favor of the finding and that it is not so significant that a reasonable factfinder could not have formed a firm conviction or belief that termination of Mother's and Father's parental rights was in J.B.'s and J.A.B.'s best interest. After consideration of the *Holley* factors and the evidence presented to the court, we conclude that the evidence is legally and factually sufficient to support the court's finding that the best interest of the children will be served by terminating Mother's and Father's parental rights.

**CONCLUSION**

For the reasons stated in this opinion, we overrule Mother's issue challenging the trial court's finding that termination of her parental rights is in J.B.'s and J.A.B.'s best interest. We also overrule Father's issues challenging the court's finding that he engaged in conduct that endangered J.B.'s and J.A.B.'s physical or emotional well-being and that termination

17

of his parental rights is in the children's best interest.  Consequently, we affirm the trial court's order of termination.

                         _____

                         Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed:  May 6, 2020